**NATIONAL COALITION GOVERNMENT OF THE UNION OF BURMA, et al.,** Plaintiffs,

v.

**UNOCAL, INC., et al., Defendants.**

No. CV 96–6112 RAP BQRX.

United States District Court, C.D. California.

Nov. 5, 1997.

Peter A. Schey, Carlos Holguin, National Center for Immigrants Rights Inc., Los Angeles, CA, John C. Bonifaz, Cristobal Bonifaz, Cristobal Bonifaz Law Offices, Amherst, MA, Terry Collingsworth, International Labor Rights & Education Fund, Washington, DC, for Plaintiffs.

Edwin V. Woodsome, Jr., Kristin A. Linsley, Daniel P. Collins, Douglas A. Axel, Munger Tolles & Olson, Los Angeles, CA, for Defendant.

ORDER GRANTING IN PART AND DENYING IN PART UNOCAL'S MOTION TO DISMISS FOR LACK OF STANDING; LACK OF SUBJECT MATTER JURISDICTION; FAILURE TO JOIN A PARTY UNDER RULE 19; AND FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

PAEZ, District Judge.

## I.

### Introduction

Plaintiffs, John Doe I, II, III, and IV, the Federation of Trade Unions of Burma ("FTUB") on behalf of itself, its affiliate unions, its injured members and the injured members of its affiliates, and the National Coalition Government of the Union of Burma ("NCGUB"), on behalf of the Union of Burma and the citizens of the Union of Burma, bring this action for compensatory and equitable relief against defendants Unocal Corporation ("Unocal") and the Yadana Natural Gas Project (the "Project"). In essence, plaintiffs allege that they, and, with respect to the NCGUB and the FTUB, their members, have been injured as a result of violations of international human rights allegedly committed by the controlling government in Burma, the State Law and Order Restoration Council's ("SLORC"). According to plaintiffs, SLORC has engaged in numerous human rights abuses, including torture, forced labor and confiscation of property, in the furtherance of a joint venture to extract natural gas from the Andaman Sea and transport it across Burma to Thailand.

Plaintiffs allege that Unocal is liable for SLORC's alleged violations of international and California laws by virtue of its role as a joint venturer or implied partner in the Project. According to plaintiffs' First Amended Complaint, the Project was established to exploit natural gas resources in the Yadana gas field off the coast of Burma by developing platforms and constructing a pipeline to transport gas from the Yadana field to the Thai border. Plaintiffs contend that Unocal knew of, authorized, acquiesced in, or ratified the human rights abuses allegedly committed in furtherance of the Project.

Shortly after this action was filed, another group of Doe plaintiffs, farmers from the Tenasserim region in Burma, filed a related class action against Unocal, two Unocal officers and several alleged joint venturers in the Yadana gas pipeline project, including SLORC and the Myanma Oil and Gas Enterprise ("MOGE"), a state-owned company that produces and sells energy products. *John Doe I v. Unocal Corp.*, CV 96–6959 RAP (BQx). The two cases involve similar allegations by the individual Doe plaintiffs, and the Court notes that it has addressed several of the issues raised on the pending motion in its published order on Unocal's motion to dismiss the claims in *John Doe I*. *John Doe I v. Unocal Corp.*, 963 F.Supp. 880 (C.D.Cal. 1997).[1] Nonetheless, the cases have not been

---

1. In *John Doe I,* the Court resolved a number of difficult issues, some of which are raised again in this action, albeit with different factual allegations and legal claims asserted. In *John Doe I,* the Court held that: (1) SLORC and MOGE were entitled to sovereign immunity pursuant to the Foreign Sovereign Immunities Act ("FSIA"); (2) SLORC and MOGE were not indispensable parties under Rule 19; (3) subject-matter jurisdiction over plaintiffs' claims against the remaining defendants was available under the Alien Tort Claims Act ("ATCA") and 28 U.S.C. § 1367; (4) the Court was not required to reach jurisdictional questions concerning the Torture Victim Protection Act ("TVPA") and RICO; (5) prudential concerns embodied in the Act of State doctrine did not preclude consideration of plaintiffs' claims; (6) plaintiffs pled sufficient facts to survive Unocal's motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6); (7) plaintiffs claims were not

consolidated, and the Court considers the issues presented here in light of the plaintiffs' allegations in this action.

In the instant case, plaintiffs contend defendants are liable for violations of the law of nations cognizable under the Alien Tort Claims Act, 28 U.S.C. § 1350. Plaintiffs premise defendants' liability on their participation in an alleged joint venture or implied partnership with SLORC. In addition, plaintiffs assert supplemental state law claims against both defendants for false imprisonment, intentional infliction of emotional distress, conversion, trespass and restitution, and against Unocal for negligent and reckless failure to exercise due care in conducting its international ventures, negligent infliction of emotional distress and civil conspiracy. Plaintiffs allege in their civil conspiracy claim that Unocal is liable for (a) conspiring with its subsidiaries, affiliates and others to cause injury to plaintiffs and the individuals they represent by entering into the Project with SLORC; (b) similarly conspiring to allow SLORC to use the Project to launder money in violation of 18 U.S.C. § 1956; and (c) making efforts to conceal SLORC's repressive activities. Finally, plaintiffs request injunctive relief.

Pending before the Court is the Motion of Defendant Unocal Corporation to Dismiss for Lack of Standing, Lack of Subject Matter Jurisdiction, Failure to Join a Party under Rule 19, and Failure to State a Claim upon which Relief Can Be Granted ("Motion"). The Court heard oral argument on Unocal's Motion on April 14, 1997, and took the matter under advisement. On April 24, 1997, after providing the parties' an opportunity to be heard as to whether the Court should solicit an opinion from the Department of State, the Court invited the Department of State to express its views concerning the potential ramifications of this litigation on the foreign policy of the United States. On June 6, 1997, the U.S. Department of

Justice, to which the Court's inquiry had been assigned, requested that the Court allow the United States to advise the Court of its decision on or before July 9, 1997. On July 9, 1997, the United States responded, providing the Court with a letter from Michael J. Matheson, Acting Legal Advisor, U.S. Department of State to Frank W. Hunger, Assistant Attorney General in which the Department stated that "at this time adjudication of the claims based on allegations of torture and slavery would not prejudice or impede the conduct of U.S. foreign relations with the current government of Burma." Statement of Interest of the United States, Exh. A at 4 (July 9, 1997).[2]

In the meantime, on May 20, 1997, President Clinton issued an Executive Order prohibiting new investment in Burma based upon his conclusion that the Government of Burma has committed large–scale repression of the democratic opposition in Burma after September 30, 1996. Executive Order 13047, 1997 WL 10084694 (May 26, 1997). According to the President's Executive Order, new investments are limited to activities undertaken pursuant to an agreement with the Government of Burma, or a non-governmental entity in Burma, entered into on or after the effective date of the order. *Id.*, § 4(d). No party to the instant litigation has contended that the President's order, or his Report to Congress regarding Conditions in Burma and U.S. Policy Toward Burma, 1997 WL 345718 (June 25, 1997), affects the current status of this case.

## II.

### *Factual Allegations*

Plaintiffs allege that in early 1993, Unocal joined the Yadana Natural Gas Project (the "Project") as a joint venturer and implied partner. Plaintiffs contend that the Project is a joint venture and implied partnership to

---

barred by the applicable statutes of limitation because plaintiffs raised factual question concerning whether the limitations periods were tolled; and (8) plaintiffs could amend their eighteenth claim for relief under California Business and Professions Code § 17200.

Discovery has been proceeding in the related case, and the Court is scheduled to hear oral

argument on plaintiffs' motions for a preliminary injunction and for class certification on December 8, 1997.

**2.** The Statement of Interest of the United States is attached as Exhibit A to this Order.

exploit natural gas resources in the Yadana gas field off the coast of Burma by developing platforms there and constructing a pipeline to transport gas from the Yadana field to the Thai border. Plaintiffs allege that the Project members include: Unocal Corporation; Total S.A., a French oil company; the reigning government of Burma, better known as the State Law and Order Restoration Council ("SLORC"); the Myanma Oil and Gas Enterprise ("MOGE"), a company wholly owned and operated by SLORC; and the Petroleum Authority of Thailand Exploration & Production Public Co. Ltd. ("PTTEP").

According to plaintiffs, SLORC destroyed numerous villages in the pipeline region in the Union of Burma, burning homes, forcing people to flee, and causing personal injury to the individual plaintiffs, in connection with and in the ordinary course of business of the Project. Similarly, plaintiffs allege SLORC has engaged in repression of the people living in the pipeline region, including killings, forced labor, torture and illegal detentions in furtherance of the Project.

Plaintiffs also contend that SLORC is in the process of constructing the Ye–Tavoy railroad, a 110 mile north–south railroad line running perpendicular to the proposed pipeline route. Plaintiffs allege on information and belief that the railroad will be used to transport materials and soldiers to the pipeline region to support construction of the pipeline and provide security.

Plaintiffs specifically allege that, in the ordinary course of business of the Project, SLORC uses threats of death to force thousands of Karen, Mon and Tavoyan villagers in Burma to travel to forced labor camps, carry food and tools for railroad construction, and serve as porters for the military in the pipeline region. Likewise, plaintiffs allege SLORC uses forced labor to move military battalions into the pipeline region, clear forest in the pipeline region, work on the Heinze Islands in the Andaman, construct a road alongside the route of the pipeline, and build other infrastructure related to the Project.

Plaintiffs contend that these activities have forced villagers in the railroad and pipeline regions to flee to refugee camps along the Thai border. According to plaintiffs, SLORC has responded by cutting off medicine and rice supplies intended for refugees; sponsoring armed attacks on refugee camps; and kidnapping and murdering refugees. In addition, plaintiffs allege that as a result of SLORC's forced labor practices, it gains approximately 17.5 billion kyats, or 159 million dollars, per year, in 1994–95 figures. Plaintiffs claim that SLORC uses the money obtained as a result of forced labor to finance the Project, including its military support for the Project. In fact, plaintiffs allege that the Project has provided direct payments to soldiers in units conducting operations in connection with the pipeline; purchased military equipment for the SLORC military; and paid mercenaries to provide advice, training, intelligence, and equipment to SLORC military in the pipeline region.

Plaintiffs assert that Unocal owns 28.26% of the joint venture and that SLORC's equity stake in the Project is being advanced by its partners, to be repaid from its share of gas revenues. Plaintiffs claim that Unocal's participation in the Project includes transferring money to pay its share of Project expenses; shipping equipment to the region; assigning personnel to work on the Project; providing technology and expertise for gas exploration and transportation; and monitoring and advising the other partners' performance of their obligations. According to plaintiffs, Unocal was put on notice that SLORC would use forced labor and commit other serious human rights abuses in connection with the Project, but dismissed those warnings. Plaintiffs specifically allege that Unocal's president, John Imle stated: "What I'm saying is that if you threaten the pipeline, there's gonna be more military. If forced labor goes hand in glove with the military, yes there will be more forced labor. For every threat to the pipeline, there will be a reaction." First Amended Complaint, ¶ 45.

Plaintiff John Doe I, now a refugee in Thailand, alleges that, on several occasions, SLORC has subjected him to forced labor, without compensation and under threat of death, on various railroad and pipeline projects in connection with and in the ordinary course of business of the Project. Specifical-

ly, he alleges he was forced to clear jungle along the path of the Ye–Tavoy railroad; forced to build military barracks for a SLORC camp in the pipeline region; and forced to build barracks and helipad facilities, clear jungle and land, break rocks for construction, and carry sand and rocks for construction on the Heinze Boke Island, where facilities for supporting the Project are allegedly located. *Id.* at ¶ 48. He alleges he frequently witnessed physical abuse and brutality against other forced laborers, including one worker who was beaten until he vomited blood and was then tied to a stake for 15 hours.

Finally, plaintiffs John Doe II, III and IV each allege that they owned land in Village B, located along the 39–mile pipeline route, and were not compensated when that land was confiscated by SLORC in connection with the Project.

## III.

### *Discussion*

**A. Standing**

Unocal challenges the NCGUB and the FTUB's standing to sue on the claims asserted in the First Amended Complaint.

The NCGUB alleges that it brings this action as "the legitimate representative of the Union of Burma, on behalf of the Union of Burma and the citizens of the Union of Burma which it represents." First Amended Complaint, ¶ 1. Specifically, the NCGUB alleges that the Union of Burma is harmed by the alleged systematic repression of its people. *Id.* at ¶ 41. In addition, the NCGUB alleges that it represents the people of Burma living in the railroad and pipeline region who "have suffered serious harm" as a result of SLORC's actions on behalf of the Project. *Id.* at ¶ 40.

In the First Amended Complaint, the FTUB attempts to assert claims on behalf of

its members, specifically noting injury to fishermen in the Coastal Fisherman's Union who have allegedly lost their means of livelihood as a result of SLORC's orders to close large areas of the coast near the pipeline. *Id.* at ¶ 42. Plaintiffs did not allege in the First Amended Complaint that either the NCGUB or the FTUB has been directly injured by Unocal's alleged acts in connection with the Project. Instead, plaintiffs' allegations in the First Amended Complaint relate to the NCGUB and the FTUB's claims for representational or associational standing based on the rights of their members.

██ In response to Unocal's motion to dismiss for lack of subject matter jurisdiction, however, plaintiffs submit the affidavits of U Maung Maung, General Secretary of the FTUB, and Dr. Sein Win, Prime Minister of the NCGUB.[3] On a motion to dismiss for lack of standing, it is appropriate to consider supplemental allegations of fact set forth in affidavits.

> For purposes of ruling on a motion to dismiss for want of standing, ... the trial ... court[ ] must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. [ ] At the same time, it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing. If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed.

*Warth v. Seldin,* 422 U.S. 490, 501–02, 95 S.Ct. 2197, 2206–07, 45 L.Ed.2d 343 (1975). Here, the matter is complicated by the fact that Unocal objects to the affidavits offered by plaintiffs. Unocal contends that the authors assert wholly new theories of standing that are inconsistent with the Complaint.[4]

---

3. In addition, on July 7, 1997, plaintiffs submitted a Motion to File the Supplemental Affidavit of U Maung Maung in further Opposition to Defendants' Motion to Dismiss. Hearing no objection from defendant Unocal, plaintiffs' motion to file the supplemental affidavit is granted.

4. In addition, Unocal objects that U Maung Maung and Dr. Sein Win's affidavits concern matters irrelevant to standing and subject matter jurisdiction; contain irrelevant and incompetent opinions of the declarants; contain hearsay; assert conclusions that lack proper foundation; and assert facts for which the affi-

Unocal correctly notes that plaintiffs are bound by all factual assertions in the complaint because such assertions constitute judicial admissions. See *Bellefonte Re–Insurance Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528–29 (2d Cir.1985) (court properly disregarded affidavits seeking to controvert pleadings); *Davis v. A.G. Edwards & Sons, Inc.*, 823 F.2d 105, 108 (5th Cir.1987) (factual assertions in the pleadings are conclusively binding on the party that made them).

Nonetheless, plaintiffs' allegations in the First Amended Complaint are not necessarily inconsistent with the allegations of the affiants. Nothing precludes a would–be government or union organization in exile from functioning as a relief organization for refugees. Accordingly, the Court considers the affidavits submitted by plaintiffs in conjunction with the allegations of the complaint for purposes of determining whether plaintiffs have standing to sue.

### 1. The NCGUB

■ Unocal contends that the NCGUB lacks standing to bring this action in the United States courts, either on its own behalf or on behalf of the citizens of Burma, because the United States has not recognized the NCGUB as the official government of Burma.

> It has long been established that only governments recognized by the United States and at peace with us are entitled to access to our courts, and that it is within the exclusive power of the Executive Branch to determine which nations are entitled to sue.

*Pfizer, Inc. v. Government of India*, 434 U.S. 308, 319–20, 98 S.Ct. 584, 591, 54 L.Ed.2d 563 (1978) (citing *Jones v. United States*, 137 U.S. 202, 212, 11 S.Ct. 80, 83–84, 34 L.Ed. 691 (1890); *Guaranty Trust Co. v. United States*, 304 U.S. 126, 137, 58 S.Ct. 785, 791, 82 L.Ed. 1224 (1938) ("What government is to be regarded here as representative of a foreign sovereign state is a political rather than a judicial question, and is to be determined by the political department of the

government."); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 408–12, 84 S.Ct. 923, 929–32, 11 L.Ed.2d 804 (1964) (intimating no view on doctrine that nonrecognition precludes suit by a foreign government in every situation, but concluding that, short of war, any relationship between the United States and a recognized foreign sovereign provides that sovereign the privilege of access to United States courts)).

As the Supreme Court explained over a century ago,

> [w]ho is the sovereign, de jure or de facto, of a territory is not a judicial, but is a political question, the determination of which by the legislative and executive departments of any government conclusively binds the judges, as well as all other officers, citizens and subjects of that government.

*Jones*, 137 U.S. at 212, 11 S.Ct. at 83; *see also Oetjen v. Central Leather Co.*, 246 U.S. 297, 302, 38 S.Ct. 309, 310–11, 62 L.Ed. 726 (1918) (same). Unfortunately, changes in foreign policy practices over the past twenty years have undermined the simplicity of the traditional rule, which made the existence or absence of formal recognition the sole basis for determining whether a foreign government could have access to the courts of the United States. *See* West, Mary Beth & Sean D. Murphy, "The Impact on U.S. Litigation of Non–Recognition of Foreign Governments," 26 STAN. J. INT'L. L. 435, 456–468 (Spring, 1990) (hereinafter West).

Although the Supreme Court has yet to establish a modern meaning for "recognition" in this context, the Second Circuit has explicitly held that "the absence of formal recognition cannot serve as the touchstone for determining whether the Executive Branch has 'recognized' a foreign nation for the purpose of granting that government access to United States courts." *National Petrochemical Co. of Iran v. M/T Stolt Sheaf ("NPC")*, 860 F.2d 551, 554 (2d Cir.1988). Retreating from the more formalistic rule equating recognition with a formal statement of recognition, the court noted the significance of the Depart-

ants lack personal knowledge. With respect to Unocal's evidentiary concerns, the Court considers only relevant, admissible statements

made in the affidavits and supplemental affidavit proffered by plaintiffs.

ment of State's 1977 announcement of its recent practice

> to deemphasize and avoid the use of recognition in cases of changes of governments and to concern ourselves with the question of whether we wish to have diplomatic relations with the new governments. The Administration's policy is that establishment of relations does not involve approval or disapproval but merely demonstrates a willingness on our part to conduct our affairs with other governments directly.

Diplomatic Recognition, 77 DEP'T ST. BULL. 462 (1977), quoted in West at ns. 100–101. In addition, the court commented on the importance of providing the Executive Branch sufficient latitude in foreign policy to allow a foreign government not formally recognized by the United States to have access to United States courts. *NPC,* 860 F.2d at 555. In light of the changing role of recognition in foreign policy, the *NPC* court concluded that, in the absence of formal recognition, a court presented with a foreign government's lawsuit must consider whether the Executive Branch has demonstrated its willingness to allow that government to assert its claims in the United States court system. *Id.* There, as in a number of other recent cases, the court found a Statement of Interest submitted by the Department of State resolved the issue. *Id.* (holding Iran's state-owned petrochemical company could have access to United States courts).[5]

Here, plaintiffs do not contend that the United States has formally recognized the NCGUB as the government of Burma, nor do they contend that the United States has established diplomatic relations with the NCGUB. Furthermore, despite the Court's invitation to the Department of State to express its views concerning ramifications this litigation might have on the foreign policy of the United States, that Department did not indicate in its response that it takes a position concerning the NCGUB's right to bring suit in the United States courts. *See* Statement of Interest of the United States, filed July 9, 1997 (indicating that adjudication of claims based on allegations of torture and slavery would not impede conduct of U.S. foreign relations with current government of Burma, but taking no position on legal issues presented in this litigation).

Given the procedural posture of this action, and in the face of the foregoing controlling authority, plaintiffs necessarily concede that the NCGUB does not have standing to sue in its purported capacity as the legitimate government of Burma. *See* Opp. at 6. Nonetheless, plaintiffs attempt to salvage the NCGUB's right to sue in this Court by contending that it may bring this action in its capacity as an organization representing "the movement to restore democracy in Burma." *Id.* at 9. Although nothing precludes the NCGUB from functioning both as a purported government-in-exile and as a pro-democracy organization, plaintiffs cite no authority for their position that an unrecognized foreign government not entitled to access to the United States courts may circumvent the nonrecognition corollary to the political question doctrine simply by reframing itself as a human rights organization or a pro-democracy advocacy group.

As one district court has explained, "[a]ny suit brought by a foreign government represents an effort to vindicate rights either of specific citizens or of its citizenry as a whole." *Transportes Aereos de Angola,* 544 F.Supp. at 862 (citing *Federal Republic of Germany v. Elicofon,* 358 F.Supp. 747

---

5. *See also, Transportes Aereos de Angola v. Ronair, Inc.,* 544 F.Supp. 858, 863 (D.Del.1982) (setting forth similar reasons and finding Statements of Interest dispositive); *Republic of Liberia v. Bickford,* 787 F.Supp. 397, 401 (S.D.N.Y.1992) (applying *NPC* test); *Republic of Panama v. Republic National Bank of New York,* 681 F.Supp. 1066, 1071 (S.D.N.Y.1988) (holding, in alternative, that political question doctrine and non-recognition corollary would entitle Delvalle government to claim funds for Republic of Panama rather than unrecognized, rival government of Panama); *Republic of Panama v. Citizens and Southern International Bank,* 682 F.Supp. 1544, 1545 (S.D.Fla.1988) (denying motion to intervene by Palma government in light of Acting Secretary of State's certification that the United States recognized Ambassador Sosa as legitimate representative of Panama); *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria,* 937 F.2d 44, 48 (2d Cir.1991) ("unrecognized regimes are generally precluded from appearing as plaintiffs in an official capacity without the Executive Branch's consent").

(E.D.N.Y.1972), *aff'd,* 478 F.2d 231 (2d Cir. 1973), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1443, 39 L.Ed.2d 489 (1974)). Allowing an unrecognized government to bring such a suit would constitute an acknowledgment that that government could legitimately speak on behalf of the people of the territory in question, thereby encroaching on the executive's exclusive power to determine what entity constitutes the de jure or de facto government of a foreign nation. *Id.* For example, in *Elicofon,* the district court concluded that the Weimar Art Collection, which had attempted to bring suit to recover certain paintings, was not entitled to access to the United States courts because it was "a juristic personality ... designed by the GDR to avoid the obstacle erected against a non-recognized power for the purposes of [that] litigation." *Elicofon,* 358 F.Supp. at 756. As that court put it, "[a] government is in every sense of the word acting in international affairs when it seeks the aid of a foreign government in an attempt to vindicate the private rights of specific citizens or of its citizenry as a whole." *Id.* at 752.[6]

Given that the NCGUB has not been formally recognized by the United States, and that the United States did not indicate in its Statement of Interest filed with this Court that the NCGUB should have access to the United States courts for purposes of this action, permitting the NCGUB to sue in its capacity as the purported government-in-exile of Burma would clearly require the Court to "interfere in sensitive matters of foreign policy." *Cf. Pfizer,* 434 U.S. at 319, 98 S.Ct. at 591. Likewise, allowing the NCGUB access to the United States courts in its capacity as a relief or pro–democracy organization would constitute a "judicial recognition" of the NCGUB's right to represent the people of Burma, thereby impinging upon the Exec-

utive's exclusive authority to conduct foreign policy. This is particularly so in light of the fact that the NCGUB's mandate as an organization is to restore democracy to Burma, i.e., to restore itself as the controlling government of Burma. Opp. at 9. Thus, the NCGUB lacks standing to sue in this Court, and defendant's motion is properly granted with respect to the NCGUB.[7]

### 2. The FTUB

#### a. Standing to Sue in Its Own Right

■ Like any other plaintiff, when an organization brings an action in its own behalf, rather than on behalf of its members, the organization must show that it has standing to assert its claims. Standing questions arise as a result of constitutional and prudential limitations on the scope of federal jurisdiction. *Bennett v. Spear,* —— U.S. ——, ——, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997) (citing *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). To satisfy the minimum constitutional requirements for standing:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally-protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). The *Lujan* court's articulation of the standing inquiry has been repeatedly reaf-

---

**6.** *Elicofon's* holding that to allow a separate juridical entity of a foreign state not recognized by the United States to appear in a United States court "would permit non–recognized governments to use our courts at will by creating 'juridical entities' whenever the need arises" has since been cited with approval by the Supreme Court. *First National City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 632 n. 25, 103 S.Ct. 2591, 2603 n. 25, 77 L.Ed.2d 46 (1983) (quoting *Elicofon,* 358 F.Supp. at 757).

**7.** Contrary to plaintiffs' contention in their opposition to Unocal's request for judicial notice, the Court must determine whether the NCGUB is the recognized government of Burma. However, for purposes of the standing inquiry, it is not necessary for the Court to consider whether SLORC is the recognized government of Burma or to inquire into the nature of SLORC's diplomatic relations with the United States.

firmed. *See, e.g., United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, ——, 116 S.Ct. 1529, 1533, 134 L.Ed.2d 758 (1996) ("Article III of the Constitution limits the federal judicial power to "Cases" or "Controversies," thereby entailing as an "irreducible minimum" that there be (1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision.").

■ Here, Unocal asserts that the FTUB lacks standing to sue in its own right because it has failed to allege facts sufficient to constitute injury in fact, and because any injury the FTUB has suffered is neither fairly traceable to Unocal's alleged conduct nor redressable by a favorable decision.

■ The FTUB alleges in the affidavit of its General Secretary, U Maung Maung, that its members are working in Burma "to further FTUB's objectives of providing representation to workers and establishing the right of workers in Burma to form free trade unions as per accepted international standards[.]" February 13, 1997, Affidavit of U Maung Maung, filed March 24, 1997 ("U Maung Maung Affidavit").[8] According to the FTUB's General Secretary, over the past three years, the FTUB has diverted funds from certain programs, primarily programs concerning trade union education, to provide relocation services, cash assistance, housing, food, clothing, and other essentials to numerous FTUB members who have allegedly fled SLORC's forced labor requirements. *Id.* at 2. U Maung Maung specifically asserts that it has assisted refugee members who were allegedly forced by SLORC to work clearing land and constructing the infrastructure for the Project. *Id.*

■ Unocal contends that even if the FTUB has been forced to divert resources to assist refugees attempting to escape forced labor on the Project, that diversion of resources is too attenuated to constitute injury in fact. As defendant points out, an organization's "mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself" to establish standing. *Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972) (organization claiming injury to its members' interest in conservation of natural game refuges and forests lacked standing under Administrative Procedures Act); *see also American–Arab Anti–Discrimination Committee v. Thornburgh,* 970 F.2d 501, 509 (9th Cir. 1992) (concluding plaintiff organization's allegations established special interest, but were insufficient to provide standing to sue on its own behalf).

■ On the other hand, where a defendant's illegal practices have "perceptibly impaired" the plaintiff organization's ability to provide the services it was formed to provide, the organization has suffered injury in fact. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 1124–25, 71 L.Ed.2d 214 (1982) (counseling and referral organization for low-income home seekers had standing to challenge realtors' race-based steering practices under Fair Housing Act where practices impaired organization's ability to provide services); *Ragin v. Harry Macklowe Real Estate Co.,* 6 F.3d 898 (2d Cir.1993) (same); *El Rescate Legal Services, Inc. v. Executive Office of Immigration,* 959 F.2d 742, 748 (9th Cir.1992) (plaintiff organization had standing to challenge defendant's application of Bureau of Immigration Affairs policy not to interpret portions of immigration court hearings where implementation of policy perceptibly impaired organization's ability to assist Central American refugees in obtaining asylum and avoiding deportation in immigration court proceedings).[9]

8. Where standing is challenged on a motion to dismiss, "general factual allegations of injury resulting from the defendant's conduct" are sufficient and the plaintiff need not set forth specific facts proving the injury. *Lujan,* 504 U.S. at 561, 112 S.Ct. at 2136–37.

9. Courts in the Ninth Circuit have repeatedly applied *Havens Realty.* Most recently, the Ninth Circuit affirmed a decision from this district in which the district court found an artists' organization had suffered a cognizable injury and, therefore, had standing to bring a first amendment challenge against the National Endowment for the Arts based on the organization's expendi-

In *Metropolitan Washington Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 265, 111 S.Ct. 2298, 2306, 115 L.Ed.2d 236 (1991), the Supreme Court concluded that Citizens for the Abatement of Aircraft Noise, Inc. ("CAAN") had standing to challenge an Act of Congress conditioning the transfer of operating control of two District of Columbia area airports to the Metropolitan Washington Airports Authority ("MWAA") on the creation of a Board of Review, composed of nine congressional representatives and vested with veto power over the decisions of MWAA. CAAN contended the conditions of the transfer constituted a violation of the principle of separation of powers. *Id.* at 255, 111 S.Ct. at 2301. Looking to the allegations of the complaint, the Supreme Court concluded that CAAN would suffer a cognizable injury if the master plan, which had been created in the shadow of the Board of Review's veto power, were implemented because the master plan would not only increase noise, pollution and the danger of accidents, but would create "an impediment to a reduction in that activity ... injur[ing] CAAN by making it more difficult for CAAN to reduce noise and activity at National." *Id.* at 265, 111 S.Ct. at 2306. The court found the future impediment to CAAN's goals was fairly traceable to the creation of the veto power, and that invalidation of the veto power would prevent enactment of the master plan, redressing the alleged injury. *Id.*

Here, taking the allegations of the complaint as true and considering the affidavits of the FTUB's General Secretary, U Maung Maung, as we must on a motion to dismiss

for lack of standing, the FTUB has diverted funds from trade union education programs to provide relief to refugee members who were forced by SLORC, Unocal's joint venturer or implied partner, to work clearing land and constructing the infrastructure for the Project. Thus, the actions of Unocal's alleged joint venturer or implied partner have perceptibly impaired the FTUB's normal practices by forcing the FTUB to divert resources to respond to the flow of refugees fleeing forced labor on the Project. Consequently, applying the reasoning of the Supreme Court in *Havens Realty* and its progeny, the Court is constrained to conclude that the FTUB has alleged a cognizable injury by alleging impairment of its ability to work toward its objectives of providing representation to workers and establishing the right of workers in Burma to form free trade unions.

Moreover, given plaintiffs' allegations, the FTUB's injury is fairly traceable to the alleged violations of international law directed at FTUB members by Unocal's alleged joint venturer or implied partner, SLORC, in that the violations allegedly caused the FTUB to divert resources from its primary objectives in order to aid refugees fleeing forced labor on the Project.

Finally, it is likely that the FTUB's alleged financial injury would be redressed by recovery on its negligence claim.[10] The FTUB alleges that defendant Unocal breached its duty to exercise due care in conducting its international ventures, proximately causing injury to the FTUB. Were the FTUB to recover on this claim, it would likely obtain

ture of resources to advocate against the implementation of a decency standard in the provision of federal grants to artists and to assist its members in responding to the standard. *Finley v. National Endowment for the Arts*, 795 F.Supp. 1457, 1469 (C.D.Cal.1992), *aff'd*, 100 F.3d 671 (9th Cir.1996), *petition for certiorari filed* August 29, 1997.

The District of Columbia and the Fifth Circuits have rejected attempts to bootstrap costs of the legal challenges alone into Article III injury in fact. *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C.Cir.1990) (injury established where plaintiff diverts resources "to programs independent of its suit challenging the action."); *Association for Retarded Citizens of Dallas v. Dallas*

*County Mental Health & Mental Retardation Center Board of Trustees*, 19 F.3d 241 (5th Cir.1994) (limiting organizational standing based on lost resources where only resources lost are the legal costs of bringing a lawsuit to oppose a defendant's actions). Those decisions are not applicable here because the FTUB alleges it has expended resources by directly assisting refugees, not merely by bringing this action, or any other action, to protect its members' interests.

10. The Court notes that plaintiffs' First Amended Complaint does not explicate which claims for relief are asserted by the FTUB, and the Court can only assume that the FTUB intended to assert all claims pled.

financial redress for resources expended as a result of Unocal's allegedly negligent acts.[11]

The remaining claims asserted in the complaint are tort claims that concern the injuries allegedly suffered by the various Doe plaintiffs and members of the FTUB and NCGUB. None of those claims provide a basis for the sort of monetary relief the FTUB seeks.[12] Were plaintiffs to prevail on claims for false imprisonment, intentional infliction of emotional distress, conversion, trespass, negligent infliction of emotional distress, restitution or violations of international law under the ATCA,[13] the recovery would do nothing to redress the FTUB's alleged loss resulting from diversion of the organization's resources. Consequently, the FTUB does not have standing to assert those claims.

In sum, the FTUB has standing to sue Unocal for damages because the FTUB sufficiently alleges that Unocal's negligence injured the FTUB's organizational interests, and the relief sought is likely to redress the FTUB's alleged financial injury. Accordingly, Unocal's motion to dismiss the FTUB for lack of standing is granted in part and denied in part. Plaintiffs shall have leave to amend their complaint to state the FTUB's separate claim for negligence.

**11.** Whether the FTUB can state a claim for negligence is another matter. To determine whether the FTUB has standing to assert its negligence claim the Court looks, not to the merits, but to whether success on the claim will redress the alleged injury. *Cf. Bennett,* —— U.S. at ——, 117 S.Ct. at 1165 (question is whether injury will likely be redressed, i.e. whether the Bureau of Reclamation will refrain from imposing challenged water level restrictions if the Biological Opinion of the Fish and Wildlife Service is set aside).

**12.** Furthermore, although plaintiffs include a plea for injunctive relief, and although injunctive relief would likely redress the FTUB's future diversion of resources injury, it does not appear that the FTUB has alleged any violation of the law upon which injunctive relief could be premised. Unlike the plaintiffs in *Havens Realty* and its progeny, the FTUB has not alleged violations of a statute that provides for injunctive relief. Nor, for that matter, has the FTUB alleged the sort of constitutional violations at issue in *CAAN* and *Finley.* The only claim directed at the diversion of resources that constitutes the FTUB's alleged injury to its organizational interests is its negligence claim. Accordingly, although it is

### b. Associational Standing

In the First Amended Complaint, the FTUB asserts claims on behalf of its members, specifically alleging injury to fishermen in the Coastal Fisherman's Union who have lost their means of livelihood as a result of SLORC's orders to close large areas of the coast near the pipeline. *Id.* at ¶ 42. In the affidavit offered in response to Unocal's standing challenge, the FTUB augments its allegation, stating that FTUB members have been subjected to forced labor on the Project. U Maung Maung Affidavit at 2. Unocal asserts that the FTUB lacks standing to assert the claims of its members. The test for associational standing is firmly entrenched:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Brown Group,* 517 U.S. at ——, 116 S.Ct. at 1534 (quoting *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977)).[14]

immaterial for purposes of standing, the Court notes that it seems unlikely that the FTUB will be able to obtain injunctive relief in its own right based on the claims asserted.

**13.** With respect to the ATCA, the FTUB has not directed the Court's attention to any torts against it that were allegedly committed in violation of the law of nations or a treaty of the United States. *See* 28 U.S.C. § 1350.

**14.** Although the first two prongs of the test set forth constitutional standing requirements, the third prong is prudential. *Id.* at 1535–36. Accordingly, Congress may abrogate the limitation imposed by the judicially-created third prong of the associational standing test. *Id.* at 1537. In *Brown Group,* the Supreme Court considered whether associational standing was available under the Worker Adjustment and Retraining Notification Act (the WARN Act), in which Congress explicitly authorized unions to sue on behalf of their members when an employer fails to give workers 60 days notice before a plant closing or mass layoff as required by the statute. *Id.* at 1531. Looking to the statutory language, the Supreme Court found that Congress had abrogat-

Here, the FTUB's individual members, and perhaps its union members, would have standing to bring forced labor claims in their own right. In addition, the FTUB's interest as a union in protecting workers' rights and preventing forced labor clearly satisfy the second prong of the *Hunt* test. Nonetheless, the FTUB lacks associational standing because both the claims asserted and the relief sought require the participation of individual members of its member unions.

It is generally accepted that associational standing is precluded where the organization seeks to obtain damages on behalf of its members. *Brown Group*, 517 U.S. at ——, 116 S.Ct. at 1535 (citing *Telecommunications Research & Action Center v. Allnet Communication Services, Inc.*, 806 F.2d 1093, 1094–95 (D.C.Cir.1986)). "[C]laims for monetary relief necessarily involve individualized proof and thus the individual participation of association members, thereby running afoul of the third prong of the *Hunt* test." *United Union of Roofers, Waterproofers, and Allied Trades No. 40 v. Ins. Corp. of America*, 919 F.2d 1398, 1400 (9th Cir.1990). Likewise, restitution is not available where it would require individualized proof to determine whether members were entitled to relief. *Cf. Lake Mohave Boat Owners v. National Park Service*, 78 F.3d 1360, 1367 (9th Cir.1996).

Because an association usually cannot bring an action for damages or restitution on behalf of its members, the FTUB is limited to seeking injunctive relief on behalf of its members. However, as Unocal points out, even the FTUB's claim for injunctive relief

fails to satisfy the third prong of the *Hunt* test.[15] As discussed above, all the claims asserted in the First Amended Complaint are tort claims based on harm to the individual Doe plaintiffs. Those tort claims can only be adjudicated by considering the testimony and other evidence of the people allegedly forced to work on the Project. The FTUB is simply not a suitable proxy. Consequently, the FTUB lacks standing to sue, and defendant's motion to dismiss the FTUB's claims is properly granted.[16]

## B. Subject–Matter Jurisdiction

This Court has subject-matter jurisdiction over plaintiffs' action against defendants Unocal and the Project because the Doe plaintiffs' claim under the Alien Tort Claims Act ("ATCA") presents a federal question.[17] The ATCA provides that

[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

28 U.S.C. § 1350. Thus, to state a claim under the ATCA, a plaintiff must allege (1) a claim by an alien, (2) alleging a tort, and (3) a violation of international law. In most cases under the ATCA, however, a violation of international law is properly pled only where defendants have allegedly acted under color of official authority. *In re Estate of Ferdinand E. Marcos Human Rights Litigation*, 978 F.2d 493, 501–02 (9th Cir.1992) ("*Estate I*") (citation omitted).

Here, the individual plaintiffs are aliens, and they assert tort claims. The parties

---

ed the prudential requirement that neither the claim asserted nor the relief sought depend upon the participation of individual members of the association. *Id.* at 1537. Plaintiffs would have the Court apply the decision in *Brown Group* here, but they ignore the obvious distinction: Congress has not abrogated the third prong of the associational standing test with respect to any of the tort claims the FTUB attempts to assert on behalf of its members.

**15.** In addition, the request for equitable relief is so vague as to raise potential Fed.R.Civ.P. 8 problems.

**16.** Unocal also notes that an organization only has associational standing when it has a clear

mandate from its membership to take the position asserted in the litigation. In other words, the FTUB cannot have associational standing without an allegation that its members "have either requested to be represented or consented to be represented" by the FTUB. See, *Natural Resources Defense Council, Inc. v. United States EPA*, 507 F.2d 905, 910 (9th Cir.1974); *Associated General Contractors v. Coalition for Economic Equity*, 950 F.2d 1401, 1408–09 (9th Cir.1991).

**17.** Plaintiffs also premise subject–matter jurisdiction on diversity of citizenship. First Amended Complaint, ¶ 11. In light of the federal question presented under the ATCA, however, the Court need not consider the availability of diversity jurisdiction.

dispute, however, whether plaintiffs may assert their claims under the ATCA against Unocal, given that Unocal is a private entity.

### 1. Violation of International Law

 First, "[i]t is [ ] well settled that the law of nations is part of federal common law." *Estate I*, 978 F.2d at 502. "[S]ection 1350 does not require that the action 'arise under' the laws of the United States, but only mandates 'a violation of the law of nations' in order to create a cause of action." *In re Estate of Ferdinand Marcos Human Rights Litigation*, 25 F.3d 1467, 1475 (9th Cir.1994) ("*Estate II*"). The norms of the law of nations are found by consulting juridical writings on public law, considering the general practice of nations, and referring to judicial decisions recognizing and enforcing international law. *See Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir.1996). Thus, a court applying the ATCA must determine "whether there is an applicable norm of international law, whether it is recognized by the United States, what its status is, and whether it has been violated." *Estate I*, 978 F.2d at 502.

 Jurisdiction under the ATCA may be premised on alleged violations of a jus cogens, or peremptory, norm. *Id.* at 500; *see also Estate II*, 25 F.3d at 1475.[18] The Ninth Circuit recently reiterated that torture, murder, genocide and slavery all constitute violations of jus cogens norms. *United States v. Matta–Ballesteros*, 71 F.3d 754, 763–65 (9th Cir.1996), as amended, 98 F.3d 1100 (1996) (citing *Siderman de Blake*, 965 F.2d at 717), *cert. denied,* —— U.S. ——, 117 S.Ct. 965, 136 L.Ed.2d 850 (1997). In *Siderman de Blake*, the Ninth Circuit explicitly concluded that the prohibition against official torture rises to the level of a jus cogens norm. *Siderman de Blake*, 965 F.2d at 717.

Thus, John Doe I's claims of torture in violation of international law easily satisfy the ATCA's requirement that the individual plaintiffs allege a violation of international law.

 By contrast, a foreign sovereign's expropriation of its national's property does not constitute a jus cogens violation of the law of nations and, therefore, is not cognizable under § 1350. *Chuidian v. Philippine National Bank*, 912 F.2d 1095, 1105 (9th Cir.1990) ("Expropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law.") (citations omitted); *Guinto v. Marcos*, 654 F.Supp. 276, 280 n. 1 (S.D.Cal. 1986) (same, in context of § 1350 inquiry). Consequently, only John Doe I, who alleges that he was tortured, has asserted a violation of international law under the ATCA. The remaining Doe plaintiffs have limited their claims to expropriation, thereby precluding suit under the ATCA.

### 2. State Action

 In the typical action under the ATCA against a non-state actor, courts look to the standards developed under 42 U.S.C. § 1983 to determine whether the claim will stand. *Kadic*, 70 F.3d at 245. "A private individual acts under color of law within the meaning of section 1983 when he acts together with state officials or with significant state aid." *Id.* (concluding plaintiffs entitled to prove their allegations that private actor acted under color of law by acting in concert with Yugoslav officials or with significant Yugoslav aid).[19]

Both the Ninth Circuit and the Supreme Court have recognized that "cases deciding when private action might be deemed that of

---

**18.** As defined in the Vienna Convention on the Law of Treaties, a jus cogens norm, also known as a 'peremptory norm' of international law, 'is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character.'
*Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir.1992). "While jus cogens and customary international law are related, they

differ in one important respect. Customary international law, like international law defined by treaties and other international agreements, rests on the consent of states." *Id.*

**19.** To constitute a state under international law, an entity need only have a defined territory and a permanent population under the control of its own government, with the capacity to engage in formal relations with other states. *Kadic*, 70 F.3d at 245.

the state have not been a model of consistency." *George v. Pacific–CSC Work Furlough,* 91 F.3d 1227, 1230 (9th Cir.1996) (citing *Lebron v. National R.R. Passenger Corp.,* 513 U.S. 374, 377–79, 115 S.Ct. 961, 964, 130 L.Ed.2d 902 (1995)), *cert. denied,* —— U.S. ——, 117 S.Ct. 746, 136 L.Ed.2d 684 (1997). Nonetheless, "[t]he Supreme Court has articulated four distinct approaches to the state action question: public function, state compulsion, nexus, and joint action." *Id.* Whether the concerns are treated as separate tests or as factors for consideration, courts must necessarily make a fact-bound inquiry. *Id.* Consequently, the state-action inquiry is more easily resolved on summary judgment than on a motion to dismiss because the court must review the facts and "circumstances surrounding the challenged action 'in their totality.'" *Collins v. Womancare,* 878 F.2d 1145, 1150 (9th Cir.1989). Although the Court must reserve the final determination regarding state action for summary judgment, the Court considers Unocal's argument that plaintiffs cannot possibly prevail on a joint action theory based on the allegations of the complaint.

The fundamental concept of the joint action theory is that "[p]rivate persons, jointly engaged with state officials in the challenged action, are acting [ ] 'under color' of law[.]" *Dennis v. Sparks,* 449 U.S. 24, 27–28, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980) (concluding private actors who successfully conspired to bribe judge were liable as state actors under § 1983 despite judicial immunity). Under the joint action test, "courts examine whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Gallagher v. Neil Young Freedom Concert,* 49 F.3d 1442, 1453 (10th Cir.1995) (citing *Collins,* 878 F.2d at 1154). Thus, under one version of the test, where there is a "substantial degree of cooperative action" between the state and private actors in ef-

fecting the deprivation of rights, state action is present. *Id.* Other courts have found that the joint action test requires that the state and private actors "share a common, unconstitutional goal." *Id.* (citing *Cunningham v. Southlake Ctr. for Mental Health, Inc.,* 924 F.2d 106, 107 (7th Cir.1991)).

■■■ In a lengthy discussion of joint action under § 1983, the Ninth Circuit explained in *Collins* that one can establish joint action by demonstrating the existence of a conspiracy, but that "[j]oint action also exists where a private party is 'a willful participant in joint action with the state or its agents.'" *Collins,* 878 F.2d at 1154. The core question is "whether the state has so far insinuated itself into a position of interdependence with the private entity that it must be recognized as a joint participant in the challenged activity." *Id.* (internal brackets omitted) (citing *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725, 81 S.Ct. 856, 861–62, 6 L.Ed.2d 45 (1961)). As a result, joint action requires "a substantial degree of cooperative action." *Id.; see also George,* 91 F.3d at 1231 (citing *Fonda v. Gray,* 707 F.2d 435, 437 (9th Cir. 1983) ("A private party may be considered to have acted under color of state law when it engages in a conspiracy or acts in concert with state agents to deprive one's constitutional rights.")); *Carmichael v. United Technologies Corp.,* 835 F.2d 109, 113–14 (5th Cir.1988) (assuming, without deciding, that ATCA confers jurisdiction over private parties who conspire in, or aid and abet, official acts of torture by one nation against the citizens of another nation).[20]

■■■ In short, joint action exists, not only where a conspiracy is alleged, but also where "a private party is 'a willful participant in joint action with the State or its agents.'" *Collins,* 878 F.2d at 1154; *see also, Sable Communications of California, Inc. v. Pacific Telephone & Telegraph Co.,* 890 F.2d 184,

---

**20.** Defendants' reliance on *NCAA v. Tarkanian,* 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988), is misplaced. There, the Supreme Court concluded that a claim based on state action might lie against the University of Nevada, Las Vegas, ("UNLV") if, by embracing the NCAA's rules, the University transformed those rules into state rules and the NCAA into a state actor. *Id.*

The Court found, however, that there was "no suggestion of impropriety respecting the agreement between the NCAA and UNLV." *Id.* at 197 n. 17, 109 S.Ct. at 464 n. 17. The Court contrasted that case with the situation in *Dennis,* where conspirators became state actors when they entered into a corrupt bargain with the judge. *Id.*

189 (9th Cir.1989) (following *Collins,* and holding that plaintiff need not establish existence of conspiracy to violate plaintiff's rights, and need only show substantial degree of cooperative action).[21] Nonetheless, a private person is only liable under a joint action theory "if the particular actions challenged are inextricably intertwined with those of the government." *Mathis v. Pacific Gas & Electric Co.,* 75 F.3d 498, 503 (9th Cir.1996) (finding no state action because plaintiff failed to present evidence of direct or indirect support of state officials in actual decision to terminate him, despite evidence that PG & E conducted investigation that led to information implicating plaintiff in drug transactions, in close cooperation with County drug task force); *see also, Beanal v. Freeport–McMoRan, Inc.,* 969 F.Supp. 362, 379 (E.D.La.1997) (allegations of military presence in connection with challenged conduct insufficient to satisfy joint action test in action against U.S. corporation with subsidiary that allegedly engaged in human rights abuses in Indonesia; plaintiff was required to allege that Indonesian military "jointly cooperated in the conduct, jointly participated in the conduct, influenced the conduct or played an integral part in the deprivation of human rights").[22]

Even before the Second Circuit's decision in *Filartiga v. Pena–Irala,* 630 F.2d 876 (2d Cir.1980), which foreshadowed a new era of reliance on § 1350 in international human rights cases, the Ninth Circuit had recognized the possibility of proceeding under § 1350 against a private defendant based on the defendant's status as a joint tortfeasor with the United States government. *Nguyen Da Yen v. Kissinger,* 528 F.2d 1194, 1202 n. 13 (9th Cir.1975); *see also Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 793 n. 24

**21.** Defendants' reliance on *Taylor v. List,* 880 F.2d 1040 (9th Cir.1989), to the exclusion of Ninth Circuit authority cited in the text is misleading. In *Taylor,* the court reiterated that a private person acts under color of state law by wilfully participating in joint action with state officials to deprive others of constitutional rights, and affirmed entry of summary judgment in favor of a prison psychiatrist, Freeman, who had refused to testify on behalf of the § 1983 plaintiff during his criminal trial for murder. *Id.* at 1048. The Ninth Circuit concluded that Freeman was entitled to judgment because Taylor had failed to prove Freeman conspired with state officials to deprive Taylor of his constitutional right to self-representation. *Id.* The court explained that a private person must share *the common objective* of the conspiracy in order to be liable under § 1983, and that "mere passive acquiescence in the direction of state officials generally is not sufficient." *Id.* To the extent *Taylor* can be read as requiring a conspiracy to establish joint action, it directly conflicts with other Ninth Circuit decisions. In fact, the *Taylor* court issued its decision just three weeks after the decision in *Collins* without mentioning the earlier decision or distinguishing the holding in *Collins.* Moreover, decisions since *Taylor* have continued to apply the rule enunciated in *Collins. See, e.g., Sable Communications,* 890 F.2d at 189; *Mathis,* 75 F.3d at 503.

As one district court recently put it, any requirement that joint action requires an actual agreement to violate a person's rights must be understood to mean "an agreement to engage in the act that constitutes the violation." *Groom v. Safeway, Inc.,* 973 F.Supp. 987, 990 (W.D.Wash. 1997). In *Groom,* the court found Safeway acted under color of state law when it hired a Seattle police officer to deter theft in its store and the officer subjected plaintiff to an unreasonable detention and search, depriving her of her constitutional rights. *Id.* at 989–92. That court reasoned:

> Safeway did more than cloak itself with the authority of the state: it hired an instrument of the state's power. Officer Hori, his uniform, his badge, and his gun were all hired to serve Safeway's goal of deterring theft in its stores. Although Hori acted in his capacity as a police officer, he did so on Safeway's time. Safeway stresses that the way in which Hori performed *his duties was not subject to Safeway's control,* but Hori nonetheless performed those duties in Safeway's store and on Safeway's behalf, presumably he could not have wandered out of the store to patrol the surrounding neighborhood. Thus, the employment relationship gives the private entity and the state agent an overlapping *identity* and *interest* and sufficiently involves the state in the relevant actions of the private entity to bring those actions under color of state law.

*Id.* at 991–92. Although the factual predicate is not yet sufficiently established in this case to resolve the joint action inquiry, the *Groom* case appears to provide a useful parallel to the unusual circumstances presented here.

**22.** The *Mathis* court noted in dicta that if the joint action between PG & E and the County drug task force in conducting the investigation had itself violated plaintiff's rights, "if the undercover agent had dragged him into a basement and pummeled him into confessing drug use, for instance—that would likely have supported a verdict on a joint action theory." *Id.,* 75 F.3d at 503. The hypothetical question presented there is akin to the allegations in the pending action.

(D.C.Cir.1984) (noting limited possibility of jurisdiction over private defendants under § 1350). In a class action against various United States government officials and agencies in which the plaintiffs were a group of children allegedly removed from Vietnam and brought to the United States for adoption in violation of their international and constitutional rights, the *Da Yen* court commented, in dicta, that jurisdiction might be available under § 1350. *Id.* The court suggested that removal and detention of an alien in another country might well be a tort in violation of the law of nations, and that, if it were a cognizable claim, the government defendants' involvement in the airlift that removed the children from Vietnam and brought them to the United States would certainly make those defendants joint tortfeasors with the non–party adoption agencies. *Id.* In fact, the court indicated that the adoption agencies might be properly joined as defendants on the basis of their status as joint tortfeasors.[23]

 Here, plaintiffs allege that Unocal and SLORC, the controlling government in Burma, are joint venturers or implied partners, and that Unocal's president John Imle has stated to pipeline opponents: "What I'm saying is that if you threaten the pipeline, there's gonna be more military. If forced labor goes hand in glove with the military, yes there will be more forced labor. For every threat to the pipeline, there will be a reaction." First Amended Complaint, ¶ 45.

Although plaintiffs allege that Unocal (1) conspired with its subsidiaries, affiliates and others to cause injury to plaintiffs, including John Doe I, by entering into the Project with SLORC; (2) similarly conspired to allow SLORC to use the Project to launder money in violation of 18 U.S.C. § 1956; and (3) made efforts to conceal SLORC's repressive activities, plaintiffs do not allege that Unocal conspired with either SLORC or MOGE to commit the violations of international law alleged in the complaint. Nonetheless, the individual plaintiffs' allegations are sufficient to support subject–matter jurisdiction under

the ATCA because, when construed in the light most favorable to plaintiffs, they suggest that Unocal may have been "a willful participant in joint action with the State or its agents." *Collins,* 878 F.2d at 1154 (quoting *Sparks,* 449 U.S. at 27–28, 101 S.Ct. at 186–87); *Sable Communications,* 890 F.2d at 189. In other words, defendants' challenged actions are allegedly inextricably intertwined with those of the SLORC government. *See Mathis,* 75 F.3d at 503; *Beanal,* 969 F.Supp. at 379.

### 3. Private Liability Absent State Action

Even in the absence of state action, Unocal could conceivably be liable for certain violations of international law alleged by plaintiff John Doe I. In *Estate I,* the court stated, without significant analysis, that "[o]nly individuals who have acted under official authority or under color of such authority may violate international law...." *Id.* at 501–01 (citing *Tel–Oren,* 726 F.2d at 791–95 (Edwards, J., concurring) (rejecting notion that purely private actors have responsibilities under international law)). More recently, however, the Ninth Circuit noted, without comment on its decision in *Estate I,* that it did "not need to reach the issue of whether the law of nations applies to private as opposed to governmental conduct." *Id.*

Judge Edwards commented in his well-known concurrence in *Tel–Oren* that individual liability remained available, in the face of the 19th century trend toward statism, for a handful of private acts, including piracy and slave trading. *Tel–Oren,* 726 F.2d at 794. Judge Edwards concluded that, without guidance from the Supreme Court, he would not include torture among "the handful of crimes to which the law of nations attributes individual responsibility." *Id.* at 795.

Because this action involves allegations of forced labor, and because slave trading is included in that "handful of crimes" to which the law of nations attributes individual responsibility, this action raises questions not addressed in the Ninth Circuit's decisions in

---

**23.** The court also suggested that Fed.R.Civ.P. 19 might require joinder of the adoption agencies. *Id.* The Court's discussion, infra, of the applica-

bility of Rule 19 in this case should dispel any concern that joint tortfeasors must necessarily be joined for the litigation to proceed.

*Estate I* and *Estate II*. However, the recent decision by the Second Circuit in *Kadic* provides a reasoned analysis of the scope of a private individual's liability for violations of international law. There, the court disagreed with the proposition

> that the law of nations, as understood in the modern era, confines its reach to state action. Instead, [the court held] that certain forms of conduct violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals.

70 F.3d at 239. The *Kadic* court ultimately concluded that "[rape,] torture and summary execution—when not perpetrated in the course of genocide or war crimes—are proscribed by international law only when committed by state officials or under color of law." *Id.* at 243. However, like Judge Edwards, the *Kadic* court noted that participation in the slave trade "violates the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals." *Id.* at 239. What constitutes "slave trade," however, has not been thoroughly delineated either by the courts listing it as a peremptory norm or by the parties in this action.

· The allegations of forced labor in this case may be sufficient to state a claim for participation in slave trading. Although plaintiffs do not allege that SLORC is physically selling Burmese citizens to the private defendants, plaintiffs allege that, Unocal has knowingly accepted the benefit of and approved the use of forced labor in connection with the Project. Unocal takes the position that SLORC's alleged requirement that its citizens provide labor for government projects is more akin to a civil service requirement than to slavery or slave trade. The Court need not resolve this issue on the pending motion, however, because the Court has subject matter jurisdiction over this action based on plaintiffs' state action theory

with respect to John Doe I's claim under the ATCA. Accordingly, the Court has jurisdiction over the FTUB and John Doe I's supplemental state law claims pursuant to 28 U.S.C. § 1367.

## C. Act of State Doctrine

 The act of state doctrine precludes a court of the United States from considering a plaintiff's claims where either the claims or the defenses asserted would require the court to determine that a foreign sovereign's official acts performed in its own territory were invalid. *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp. International,* 493 U.S. 400, 405, 110 S.Ct. 701, 704–05, 107 L.Ed.2d 816 (1990). Unocal argues, in asserting the applicability of the doctrine, that by adjudicating plaintiffs' claims, this Court will necessarily pass judgment on the validity of SLORC's official acts, thereby interfering with the foreign policy efforts of the United States Congress and the President.

 The Supreme Court's treatment of the act of state doctrine has shifted over time. *Kirkpatrick,* 493 U.S. at 404, 110 S.Ct. at 704. The classic statement of the doctrine rested on notions of international comity,[24] but more recent formulations focus on the principle of separation of powers. *Id.* Taken as a whole, the act of state doctrine

> expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere.

*Sabbatino,* 376 U.S. at 423, 84 S.Ct. at 937–38. In other words, the act of state doctrine embodies the purely prudential concern that judicial inquiry into the validity of a foreign nation's sovereign acts may interfere with Executive and Congressional foreign policy

---

**24.** According to the classic statement:

Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory. Redress of grievances by reason of such acts must

be obtained through the means open to be availed of by sovereign powers as between themselves.

*Sabbatino,* 376 U.S. at 423, 84 S.Ct. at 937–38 (quoting *Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897)).

efforts. *Siderman de Blake*, 965 F.2d at 717; *see also Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1360 (9th Cir.1988) (citing *Sabbatino*, 376 U.S. at 427–28, 84 S.Ct. at 940 ("The continuing vitality of the doctrine depends on its capacity to reflect the proper distribution of functions between the judicial and political branches of Government on matters bearing upon foreign relations.")); *International Association of Machinists and Aerospace Workers v. OPEC*, 649 F.2d 1354, 1360 (9th Cir.1981).

 Because the goal of the act of state doctrine is to protect the interests of the United States and of the international community, the doctrine is not applied at every conceivable opportunity. Instead, as the Supreme Court recently put it:

Courts in the United States have the power, and ordinarily the obligation, to decide the cases and controversies properly presented to them. The act of state doctrine does not establish an exception for cases and controversies that may embarrass foreign governments, but merely requires that, in the process of deciding, the acts of foreign sovereigns taken within their own jurisdiction shall be deemed valid.[25]

*Kirkpatrick*, 493 U.S. at 405, 110 S.Ct. at 704–05. In short, the act of state doctrine may only be invoked to bar adjudication of a plaintiff's claims when the nature of the claims or defenses will require the court to declare invalid a foreign sovereign's official acts, in other words, when "the outcome of the case turns upon [ ] the effect of official action by a foreign sovereign." *Id.* at 406, 110 S.Ct. at 705.

 The Supreme Court has made it clear that the act of state doctrine is not "an inflexible and all-encompassing rule." *Sabbatino*, 376 U.S. at 428, 84 S.Ct. at 940. Rather than formalistically applying the doctrine whenever it is technically available, "a sort of balancing approach" can be used to determine whether the policies underlying the doctrine justify its application. *Kirkpatrick*, 493 U.S. at 409, 110 S.Ct. at 706–07. Thus, it is appropriate to take into account that

the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the courts can then focus on the application of an agreed principle to circumstances of fact rather than on the sensitive task of establishing a principle not inconsistent with the national interest or with international justice. It is also evident that some aspects of international law touch much more sharply on national nerves than do others; the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches. The balance of relevant considerations may also be shifted if the government which perpetrated the challenged act of state is no longer in existence, as in the *Bernstein* case, for the political interests of this country may, as a result, be measurably altered.

*Sabbatino*, 376 U.S. at 428, 84 S.Ct. at 940.

 When applying the *Sabbatino* test, the party asserting the applicability of the act of state doctrine bears the burden of proof. *See Liu v. Republic of China*, 892 F.2d 1419, 1432 (9th Cir.1989). "At a minimum, this burden requires that a party offer some evidence that the government acted in its sovereign capacity and some indication of the depth and nature of the government's interest." *Id.* (finding doctrine inapplicable where plaintiff sued the Republic of China for the assassination of her husband). Although precedent is less than clear about the

**25.** As Unocal explains in another context, the Supreme Court does not impliedly overrule precedent. *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989). The vast majority of the Supreme Court's references to the act of state doctrine limit its applicability to "official" or "public" acts of a foreign sovereign. The omission of an adjective in the cited language may not properly be taken as an expansion of the scope of the act of state doctrine, particularly in light of the Supreme Court's explicit statements in the preceding paragraph refusing to expand the doctrine, and its statements of the rule, in prior cases and earlier in the *Kirkpatrick* decision, that the doctrine applies only when the pending suit requires the Court to declare invalid the official act of a foreign sovereign. *Kirkpatrick*, 493 U.S. at 405, 110 S.Ct. at 704–05.

parameters of the "official acts" limitation, the Supreme Court has distinguished between "public and governmental acts of sovereign states on the one hand and their private and commercial acts on the other[.]" *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 695, 96 S.Ct. 1854, 1862, 48 L.Ed.2d 301 (1976). Where the facts presented are not "sufficient to demonstrate that the conduct in question was the public act of those with authority to exercise sovereign powers," the court should not presume that the conduct at issue was an "official act" of the foreign sovereign. *Cf. id.* (finding facts insufficient to show commercial conduct was public act of foreign sovereign entitled to respect in our courts where no statute, decree, order or resolution was offered in evidence to show Cuban government had repudiated obligations or "as a sovereign matter" determined to confiscate amounts due to foreign importers).

In *Liu,* the Ninth Circuit considered the *Sabbatino* factors and reversed the district court's application of the act of state doctrine. *Liu,* 892 F.2d at 1433 (considering whether state was acting in public interest, whether there was international consensus regarding alleged violation, and whether case was type that might hinder Executive Branch in formulation of foreign policy). The *Liu* court noted that the act of state doctrine, unlike the Foreign Sovereign Immunities Act ("FSIA"), takes into account "the underlying purpose of a state's action," and allowed a wrongful death action against the Republic of China ("ROC") based on vicarious liability for an ROC military official's role in the assassination in the United States of a United States resident critical of the ROC's policies. *Id.* at 1432–34 (finding international consensus condemning murder).

Here, plaintiffs seek review of alleged violations of international law, including forced labor, torture and expropriation of property. Based on the foregoing authority, the Court must determine whether SLORC is a foreign sovereign, whether the case turns on SLORC's official actions and whether the *Sabbatino* factors support or undermine application of the act of state doctrine to bar plaintiffs' claims.

## 1. The United States Conducts Diplomatic Relations with SLORC

■■■ Unocal has requested that the Court take judicial notice of the fact that the United States has "recognized" SLORC as the sovereign authority in Burma. As the Court noted above in conjunction with the discussion on plaintiffs' standing to sue, however, the United States Department of State has indicated that its modern practice is

> to deemphasize and avoid the use of recognition in cases of changes of governments and to concern ourselves with the question of whether we wish to have diplomatic relations with the new governments. The Administration's policy is that establishment of relations does not involve approval or disapproval but merely demonstrates a willingness on our part to conduct our affairs with other governments directly.

Diplomatic Recognition, 77 DEP'T ST. BULL. 462 (1977), quoted in West, supra, at ns. 100–101. Accordingly, the Court treats Unocal's request as a request to take judicial notice of the fact that the United States conducts diplomatic relations with SLORC as the sovereign authority in Burma. In support of its request, Unocal proffers portions of the Department of State, Burma Country Commercial Guide for 1995; portions of the CIA World Fact Book for 1995; and testimony of then–United States Ambassador to the United Nations, now–Secretary of State Madeline Albright before the United States Senate in 1996.

The Department of State's 1995 Burma Country Commercial Guide ("Guide") indicates that "relations between the United States and Burma have been cool since the 1988 military coup, after which the United States and other major donor countries suspended most foreign assistance." Request for Judicial Notice, Exh. A at 13. The Guide also indicates that in 1995 the United States maintained an embassy in Rangoon, Burma. *Id.* at 1. Likewise, the Central Intelligence Agency's 1995 World Fact Book lists an American Embassy and a diplomatic representative of the United States in Rangoon. *Id.,* Exh. B.

While Madeline Albright was the United States Ambassador to the United Nations, she testified before the United States Senate about the state of affairs in Burma. During her testimony she stated that SLORC does not get credit for or benefit from the aid provided by certain United Nations relief operations in Burma, noting, however, that "the advantage that SLORC has is that in fact it is unfortunately the recognized government of Burma, and therefore they are there." *Id.*, Exh. C. at 7.

Most significantly, in its Statement of Interest filed with the Court on July 9, 1997, the United States Department of State indicated that "adjudication of the claims based on allegations of torture and slavery would not prejudice or impede the conduct of U.S. foreign policy with *the current government of Burma*," indicating that the United States presently maintains some form of diplomatic relations with SLORC, as the current government of Burma. Statement of Interest of the United States, Exh. A at 2 (emphasis added).

In light of the foregoing evidence proffered by Unocal, and particularly the Statement of Interest submitted by the United States, the Court takes judicial notice of the fact that the United States conducts diplomatic relations with SLORC as the current government of Burma. Accordingly, SLORC is properly deemed a foreign sovereign for purposes of the act of state doctrine.

### 2. Unocal Has Not Shown SLORC's Challenged Acts Were Official

Whether resolution of the pending suit turns on SLORC's official actions is a more complex question. Clearly Unocal is correct that the acts of SLORC officials are at issue in this litigation. As Unocal's liability is premised on the acts of its alleged joint venturer or implied partner, plaintiffs can only assert claims against Unocal on the basis of official actions for which SLORC could conceivably be liable were it not protected by the FSIA. The fact that a foreign sovereign has disregarded its own laws does not establish that its acts were private in nature. *United States v. Merit,* 962 F.2d 917, 921 (9th Cir.1992).

Nonetheless, Unocal has presented no evidence that SLORC's alleged jus cogens violations of international law are or were official acts. "It is only when officials having sovereign authority act in an official capacity that the Act of State Doctrine applies." *Estate I,* 25 F.3d at 1471 (citing *Jimenez v. Aristeguieta,* 311 F.2d 547, 557–58 (5th Cir.1962)). Moreover, an official may violate international law under color of authority even when the official is not acting within an official mandate. *Id.* at 1472 n. 8.

In *Liu,* the Ninth Circuit found the ROC might be vicariously liable for the acts of its officer who ordered a criminal organization to assassinate Liu to prevent Liu's continued criticism of himself and the ROC, despite the fact that the ROC incurred no benefit, because, if the official's involvement in the assassination had never been revealed, "the ROC would have benefitted from the silencing of a critic." *Liu,* 892 F.2d at 1428–29 (holding official's use of ROC facilities in conjunction with use of his authority to accomplish a task, partly to benefit his employer, was sufficient to impose vicarious liability on the ROC). By analogy, SLORC could conceivably be vicariously liable for the alleged acts of its officers that benefitted SLORC's commercial interests in the Project, thereby making Unocal potentially liable under a theory that SLORC is Unocal's joint venturer or implied partner.

Moreover, as the Court noted above, the Supreme Court held in *Dunhill* that the factual showing was insufficient to demonstrate that the Cuban government's commercial conduct was a public act where no statute, decree, order or resolution was offered in evidence to show the Cuban government had repudiated its obligations or, "as a sovereign matter," had determined to confiscate amounts due to foreign importers. *Dunhill,* 425 U.S. at 694, 96 S.Ct. at 1861. Here, Unocal has not pointed to any evidence suggesting SLORC's alleged violations of international law are "public" or "official" acts of the government. Accordingly, Unocal has not satisfied its burden of proof, and, technically speaking, the act of state doctrine is not applicable. Nonetheless, the Court considers

the nature of the claims and defenses in light of the *Sabbatino* factors.

### 3. *Sabbatino* Factors

 As noted above, where the policies underlying the doctrine militate against its application, the act of state doctrine should not apply, even to claims that a foreign government's actions are or were invalid. *Kirkpatrick*, 493 U.S. at 409, 110 S.Ct. at 706 ("Sometimes, even though the validity of the act of a foreign sovereign within its own territory is called into question, the policies underlying the act of state doctrine may not justify its application.").

### a. International Consensus

 Where jurisdiction is available to consider claims based on jus cogens violations of international law, it is less likely that judicial pronouncements on a foreign sovereign's actions will undermine the policies behind the act of state doctrine. In determining whether the doctrine bars judicial review, one factor to be considered is "the degree of international consensus regarding an activity." *Liu*, 892 F.2d at 1433. The doctrine should not be applied so as to

> totally emasculate the purpose and effectiveness of the Foreign Sovereign Immunities Act by permitting a foreign state to reimpose the so recently supplanted framework of sovereign immunity, as defined prior to the Act, through the back door, under the guise of the act of state doctrine.

*Liu*, 892 F.2d at 1432 (internal quotation marks omitted).[26] In addition, as the *Kadic* court noted:

> it would be a rare case in which the act of state doctrine precluded suit under section 1350. Banco Nacional [i.e. Sabbatino] was careful to recognize the doctrine in the

absence of . . . unambiguous agreement regarding controlling legal principles . . . and applied the doctrine only in a context—expropriation of an alien's property—in which world opinion was sharply divided.

*Kadic*, 70 F.3d at 250 (internal quotation marks omitted) (citing *Sabbatino*, 376 U.S. at 428–30, 84 S.Ct. at 940–42)). In the context of jus cogens violations of international law, which are, by definition, internationally denounced, the high degree of international consensus severely undermines defendants' argument that SLORC and MOGE's alleged activities should be treated as official acts of state.

Here, plaintiffs allege defendants are responsible for acts of torture, forced labor and expropriation of the property of Burmese nationals.[27] Torture has been widely recognized as a jus cogens violation of international law.[28] With respect to allegations of forced labor, although the parties have not yet fully briefed the issue, for purposes of the pending motion, the Court concludes that the allegations of forced labor raise the potential that plaintiffs could state a claim for slavery or slave trading, which appear to be jus cogens violations.

In addition, the Court notes that plaintiffs contend Burma is a signatory to International Labor Organization Convention No. 29, which purportedly bans the use of forced labor. Plaintiffs' Opposition Memorandum at 3. Consequently, the so-called "treaty exception," may apply here, even if plaintiffs' allegations do not constitute slavery or slave trading per se.

Finally, because nations do not, and cannot under international law, claim a right to torture or enslave their own citizens, inquiry into whether a government has committed

---

26. In an earlier case involving alleged price-fixing by OPEC, the Ninth Circuit concluded that the commercial activity exception to FSIA did not dilute the act of state doctrine. *International Assn. of Machinists and Aerospace Workers*, 649 F.2d at 1360. However, in that case, the court found that the record revealed "no international consensus condemning cartels, royalties and production agreements." *Id.*

27. The Court deals separately below with the issue of the act of state doctrine in the context of plaintiffs' allegations of expropriation of property.

28. "That states engage in official torture cannot be doubted, but all states believe it is wrong, all that engage in torture deny it, and no state claims a sovereign right to torture its own citizens." *Siderman de Blake*, 965 F.2d at 717.

such acts should have no detrimental effect on the policies underlying the act of state doctrine, particularly where, as here, that inquiry is in keeping with the prior conclusions of the coordinate branches of government and has been specifically authorized by the Department of State.

### b. Sensitivity of National Nerves

 *Sabbatino* also cautions courts to consider that where the impact on foreign relations of the international issues presented is small, the justification for application of the act of state doctrine is commensurately weak. *Sabbatino*, 376 U.S. at 428, 84 S.Ct. at 940. Here, the coordinate branches of government have already denounced the foreign state's human rights abuses and imposed sanctions. More importantly, in his response to the Court's inquiry concerning the Department's views on the potential ramifications of this litigation on the foreign policy of the United States, the Acting Legal Advisor of the United States Department of State, Michael J. Matheson, stated that "at this time adjudication of the claims based on allegations of torture and slavery would not prejudice or impede the conduct of U.S. foreign relations with the current government of Burma." Statement of Interest of the United States at 2, filed July 9, 1997. In light of that statement, the Court concludes that the issues presented here have only limited implications for our foreign relations, tipping the balance against invocation of the act of state doctrine to bar plaintiffs' claims.[29]

### c. Whether Government at Issue Still Exists

The final factor set out in *Sabbatino*, whether the government allegedly responsible for the challenged acts is still in existence, is the sole consideration supporting application of the act of state doctrine. Here, SLORC is still in existence and is still the current government of Burma.

### d. Public Interest

Although *Sabbatino* did not list additional considerations in its balancing test, the Ninth Circuit has included an inquiry into "whether the foreign state was acting in the public interest." *Liu*, 892 F.2d at 1432. Here, it would be difficult to contend that SLORC officials' alleged jus cogens violations of international human rights were "in the public interest," despite the fact that they are allegedly directly connected to decisions regarding allocation and profit from Burma's natural resources.

Taking all of the factors together, the balance weighs against invocation of the act of state doctrine to bar plaintiffs' claims of torture and slavery, even if the doctrine were technically applicable.[30]

### 4. *Bernstein* Exception

Once the factual predicate for application of the act of state doctrine is satisfied, the Court must consider possible exceptions to the application of the doctrine. The Supreme Court has not definitively passed on the availability of the so-called *Bernstein* exception, which would require the courts to refrain from applying the act of state doctrine when the Executive indicates that foreign policy concerns will not be implicated by adjudication of the action. The *Sabbatino*

---

29. In the context of alleged violations of international human rights, the Ninth Circuit has noted in dicta that

> [t]he classification [act of state] might, it may be supposed, be used to prevent judicial challenge in our courts to many deeds of a dictator in power, at least where it is apparent that sustaining such a challenge would bring our country into hostile confrontation with the dictator.

*Republic of the Philippines*, 862 F.2d at 1360. Extrapolating from that decision, a suit involving acts of an alleged dictator in power is not necessarily subject to the act of state doctrine where adjudication of the matter will not bring the

nation into hostile confrontation with the foreign state. Given the circumstances of the instant case, and particularly the Statement of Interest of the United States, it is hard to imagine how judicial consideration of the matter will so substantially exacerbate relations with SLORC as to cause "hostile confrontation."

30. Following the Ninth Circuit's lead, the Court reminds the parties that "[a]s the doctrine is a pragmatic one, we cannot exclude the possibility that, at some later point in the development of this litigation, the [defendants] might produce evidence that would warrant its application." *Republic of the Philippines*, 862 F.2d at 1361.

court declined to rule on the exception because the issue was not squarely before it.

In *First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972), Justice Rehnquist authored a plurality opinion recognizing a *Bernstein* exception where the Executive indicates its position that the act of state doctrine should not be applied. Two other justices joined in the plurality opinion, and Justices Douglas and Powell each concurred on separate grounds, refusing to rely on the *Bernstein* exception. The four dissenting justices explicitly rejected the *Bernstein* exception, explaining that the "Executive Branch, however extensive its powers in the area of foreign affairs, cannot by simple stipulation change a political question into a cognizable claim." *Id.* at 789, 92 S.Ct. at 1824. In short, the viability of the exception is highly questionable. For the sake of completeness, however, the Court notes that the Statement of Interest submitted by the United States would qualify as a *Bernstein* letter authorizing the Court to proceed with plaintiffs' claims based on torture and slavery because separation of powers concerns, which underlie the act of state doctrine and allocate foreign policy to the coordinate branches of government, would not be served by invocation of the doctrine.[31]

### 5. Expropriation of Property

■ The foregoing discussion aside, Unocal is correct that under *Sabbatino*, the Court may not

> examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law.

*Sabbatino*, 376 U.S. at 428, 84 S.Ct. at 940. In *Sabbatino*, the Supreme Court discussed at length the wisdom of refraining from "characterizing foreign expropriations, however justifiably, as invalid under international

---

**31.** As the Court stated in *John Doe I*:

Unocal contends that adjudication of this case will interfere with Congressional and Executive efforts to exert pressure on SLORC to reform its human rights record. Thus, Unocal states that while vigorously attempting to encourage democratic reform and respect for human rights, Congress and the President have refrained from taking precipitous steps, such as prohibiting all American investment, that might serve only to isolate the Burmese Government [i.e. SLORC] and actually hinder efforts toward reform. This careful approach is reflected in the fact that, after a spirited debate, Congress recently granted the President conditional authority to prohibit only "new investment" in Burma, and even then only if the President certifies that Burma is once again committing certain serious human rights abuses. [] Against this backdrop, this lawsuit represents an unprecedented attempt to enmesh the federal courts in setting American foreign and economic policy toward Burma.

Unocal Memorandum of Points and Authorities in Support of Motion to Dismiss at 1. However, a review of the portions of the Congressional Record cited by Unocal reveals that the debate involved a dispute over whether to promptly impose unilateral sanctions on Burma, as advocated by Senator Helms, or refrain from immediately imposing such sanctions to allow the President to work with other nations to develop a multilateral strategy to improve conditions in Burma, as advocated by Senators Einstein and McCain.

See 142 Cong.Rec. § 8741–02, § 8753–8755 (daily ed. July 25, 1996); see also Statement by the Press Secretary, White House Office of Communications, 1996 WL 420086 at *1 (July 25, 1996). In fact, Senator Helms stated in support of his position in the debate that "[w]e know there is forced labor in Burma." *Id.* at § 8753.

Even accepting the Congressional and Executive decisions as Unocal frames them, the coordinate branches of government have simply indicated an intention to encourage reform by allowing companies from the United States to assert positive pressure on SLORC through their investments in Burma. *See id.* at § 8755 (statement of Sen. McCain) (contending that an immediate investment sanction would decrease the United States' leverage with respect to human rights violations in Burma and might increase repression of the pro-democracy activists in Burma).

Plaintiffs essentially contend that Unocal, rather than encouraging reform through investment, is knowingly taking advantage of and profiting from SLORC's practice of using forced labor and forced relocation, in concert with other human rights violations including rape and other torture, to further the interests of the Yadana gas pipeline project. Whatever the Court's final decision in this action may be, it will not reflect on, undermine or limit the policy determinations made by the coordinate branches with respect to human rights violations in Burma.

*John Doe I*, 963 F.Supp. at 895, n. 17.

law and ineffective to pass title." *Id.* at 430, 84 S.Ct. at 941. In fact, the Court specifically rejected the argument that the act of state doctrine should not apply in the context of "retaliation, discrimination and inadequate compensation." *Id.* at 433, 84 S.Ct. at 943 (noting that "general standards for determining the validity of expropriations" are lacking).

In short, the *Sabbatino* court found that determinations of, and remedial measures concerning, the validity of expropriations of property by foreign states are best left to the extensive powers of the Executive, particularly in light of the fact that "[e]xpropriations take place for a variety of reasons, political and ideological as well as economic." *Id.* at 435, 84 S.Ct. at 944. The Court concluded that the act of state doctrine applies, "[h]owever offensive to the public policy of this country and its constituent States an expropriation of this kind may be[.]" *Id.* at 436–37, 84 S.Ct. at 944–45.[32] The *Sabbatino* court found that the act of state doctrine prevented examination of the validity of acts of expropriation despite the presence of "authority, in international judicial and arbitral decisions, in the expressions of national governments, and among commentators for the view that a taking is improper under international law if it is not for a public purpose, is discriminatory, or is without provision for prompt, adequate, and effective compensation." *Sabbatino*, 376 U.S. at 429, 84 S.Ct. at 940–41.

In response to the Supreme Court's decision in *Sabbatino*, Congress enacted the Second Hickenlooper Amendment, which states, in pertinent part:

> Notwithstanding any other provision of law, no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted by any party ... based upon ... a confiscation or other taking ... by an act of that state in violation of international law[.]

22 U.S.C. § 2370(e)(2). The primary purposes of the Hickenlooper Amendment was to promote and protect U.S. investments in foreign countries. *West v. Multibanco Comermex*, 807 F.2d 820, 830 (9th Cir.1987).

More significantly, the Hickenlooper Amendment, by its own terms, is only properly invoked as an exception to the act of state doctrine where the expropriation at issue would constitute a violation of international law. The Ninth Circuit has explicitly concluded that "[e]xpropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law."[33] *Chuidian*, 912 F.2d at 1105 (considering applicability of FSIA where Philippine bank official instructed California branch of bank not to honor letter of credit issued to Philippine national); *see also Bank Tejarat v. Varsho–Saz*, 723 F.Supp. 516, 520 (C.D.Cal.1989) (confiscation by Iranian gov-

32. The *Sabbatino* court discussed the *Bernstein* cases, in which the plaintiff had brought suit to recover property allegedly taken by the Nazi government because plaintiff was Jewish, noting that, despite "the odious nature of this act of state," the court refused to consider it invalid on that ground and dismissed the case after concluding that no Executive action gave it authority to refuse to give the foreign state's act legal effect. *Id.* at 419, 84 S.Ct. at 935–36 (noting that it need not pass on the so-called *Bernstein* exception, which arose from the second *Bernstein* action, in which the act of state doctrine is purportedly held inapplicable if the Acting Legal Adviser to the State Department writes a letter relieving the court of any constraint based on the prudential concerns of the doctrine).

33. Some years ago, the Fifth Circuit set forth the same rule, acknowledging, at the same time, that

international norms are not static. That Circuit explained:

> At present, the taking by a state of its national's property does not contravene the international law of minimum human rights. This has been held to be true in much more egregious situations than the present, including cases where the plaintiff had had his property taken pursuant to Nazi racial decrees.... It may be foreign to our way of life and thought, but the fact is that governmental expropriation is not so universally abhorred that its prohibition commands the "general assent of civilized nations" ... a prerequisite to incorporation in the "law of nations".... We cannot elevate our American-centered view of governmental takings of property without compensation into a rule that binds all "civilized nations."

*Najarro de Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1397 (5th Cir.1985).

ernment of property of its national located in Iran was not a violation of international law and Hickenlooper exception did not apply). Here, each of the individual plaintiffs asserts claims for expropriation of property, including claims for conversion and trespass under California law. Plaintiffs have not alleged a violation of international law, however, because they are Burmese nationals seeking relief for alleged expropriation by SLORC of property located in Burma.[34] Consequently, the act of state doctrine requires the Court to refrain from reviewing plaintiffs' expropriation claims.

In sum, although the act of state doctrine does not preclude review of plaintiffs' claims based on allegations of torture and forced labor, the doctrine does apply in the context of plaintiffs' claims for expropriation of property. Accordingly, plaintiffs' claims for conversion and trespass are properly dismissed.

## D. Indispensable Parties

██ To determine whether an action should be dismissed under Rule 19 of the Federal Rules of Civil Procedure, the court must engage in a two-step inquiry. *Kescoli v. Babbitt*, 101 F.3d 1304, 1308 (9th Cir.1996). First, the court must determine whether the absent party is necessary and cannot be joined. Fed.R.Civ.P. 19(a) provides that a person is a necessary party if

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action[.]

If the court concludes that a party is necessary but cannot be joined, the court must then determine "whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed[.]" Fed.R.Civ.P. 19(b). In so doing, courts are generally directed to balance the following factors:

> (1) prejudice to any party or to the absent party; (2) whether relief can be shaped to

lessen prejudice; (3) whether an adequate remedy, even if not complete, can be awarded without the absent party; and (4) whether there exists an alternative forum. *Quileute Indian Tribe v. Babbitt*, 18 F.3d 1456, 1460 (9th Cir.1994). Where the necessary party is immune from suit, however, balancing may not be necessary because immunity itself may be a compelling factor. *Id.*

██ Here, plaintiffs allege that "[a]s a joint venture partner with SLORC, defendant Unocal is vicariously liable for all of the tortious acts committed by SLORC in connection with the defendant Yadana Natural Gas Project[.]" First Amended Complaint, ¶ 54. As the Court noted above, plaintiffs also allege that Unocal (1) conspired with its subsidiaries, affiliates and others to cause injury to plaintiffs, including John Doe I, by entering into the Project with SLORC; (2) similarly conspired to allow SLORC to use the Project to launder money in violation of 18 U.S.C. § 1956; and (3) made efforts to conceal SLORC's repressive activities. Unocal moves to dismiss on grounds that SLORC and MOGE are indispensable parties that cannot be joined because they would be entitled to sovereign immunity in light of this Court's recent decision in *John Doe I.*

Assuming, as we must on a motion to dismiss, that plaintiffs are able to substantiate their allegations that Unocal and SLORC are joint tortfeasors, there is no reason complete compensatory relief may not be accorded among the remaining parties. *See Forti v. Suarez–Mason*, 672 F.Supp. 1531, 1552 (N.D.Cal.1987) ("A joint tortfeasor is not a 'necessary' party within the meaning of Rule 19.") (citing Advisory Committee Notes to Fed.R.Civ.P. 19). As the Supreme Court recently explained, "[i]t has long been the rule that it is not necessary to join all joint tortfeasors to be named as defendants in a single lawsuit." *Temple v. Synthes Corp., Ltd.*, 498 U.S. 5, 7, 111 S.Ct. 315, 316, 112 L.Ed.2d 263 (1990) (reversing dismissal for failure to join joint tortfeasors in medical

---

**34.** Moreover, "any injunctive relief 'instructing a foreign sovereign to alter its chosen means of allocating and profiting from its own valuable natural resources' would affront the sovereignty of a state." *Liu v. Republic of China*, 892 F.2d 1419, 1432 (9th Cir.1989). Here, if the acts of expropriation SLORC is alleged to have commit-

ted were not done in furtherance of its chosen means of allocating its natural resources, there would be little basis for plaintiffs' theory that Unocal is responsible for SLORC's alleged acts taken in conjunction with the Project members' joint venture.

malpractice action). The *Temple* court approved the statement in the Advisory Committee Notes to Rule 19(a) that "a tortfeasor with the usual 'joint-and-several' liability is merely a permissive party to an action against another with like liability." *Id.* Unocal contends, without authority, that this long-established rule only applies in some subset of "usual cases." The fact that the underlying torts at issue here are not "ordinary" does not establish, as Unocal would have it, that a joint tortfeasor found liable for those torts is not subject to the usual joint and several liability.

Unocal next attempts to analogize this case to *Aquinda v. Texaco, Inc.*, 945 F.Supp. 625 (S.D.N.Y.1996), in which the court concluded that Ecuador and its state-owned oil company were indispensable parties. However, in that case, the court based its decision on the nature of the "extensive equitable relief sought by the plaintiffs—ranging from total environmental 'clean-up' of the affected lands in Ecuador to a major alteration of the consortium's Trans–Ecuador pipeline to the direct monitoring of the affected lands for years to come[.]" *Id.* at 627. Moreover, in *Aquinda*, Ecuador's state-owned oil company owned 100% of the pipeline and 100% of the consortium. *Id.* By contrast, Unocal allegedly owns 28.26% of the Project and pays at least a portion of SLORC's expenses, to be reimbursed from SLORC's share of the gas proceeds. Even though plaintiffs cannot obtain injunctive or declaratory relief against SLORC and MOGE in this action, complete relief can be accorded among those parties before the Court. Similarly, if injunctive relief against the existing defendants is available, such relief will not burden them any more than it would burden them if SLORC and MOGE were joined in the action. In short, SLORC and MOGE are not necessary parties, and the Court need not consider whether they are indispensable parties.[35]

## E. Failure to State a Claim

 A motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims asserted in the complaint. Accordingly, the scope of review on a motion to dismiss for failure to state a claim is limited to the contents of the complaint. *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754 (9th Cir.1994). The Court may, however, consider exhibits submitted with the complaint and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201. *Hal Roach Studios v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.1990); *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1198 (9th Cir.1988). "[A] document is not 'outside' the complaint if the complaint specifically refers to the document and if its authenticity is not questioned." *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir.1994).

 Dismissal under Rule 12(b)(6) may be based either on the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1990). The issue on a motion to dismiss for failure to state a claim is not whether the claimant will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims asserted. *Gilligan v. Jamco Development Corp.*, 108 F.3d 246, 249 (9th Cir.1997). When evaluating a Rule 12(b)(6) motion, the court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *Barron v. Reich*, 13 F.3d 1370, 1374 (9th Cir.1994). The court is not required, however, to accept "conclusory legal allegations cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg*, 18 F.3d at 754–55.

 Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990).

---

**35.** Unocal's primary argument with respect to the second prong is that it will be prejudiced as a result of its inability to conduct discovery of SLORC and MOGE if the Court lacks subpoena power. There is no evidence that the absence of this Court's subpoena power over SLORC and MOGE will have any appreciable effect on Unocal's ability to conduct discovery. Moreover, plaintiff's discovery will be similarly impeded.

The notice pleading standard set forth in Rule 8 establishes "a powerful presumption against rejecting pleadings for failure to state a claim." *Gilligan*, 108 F.3d at 248 (citations omitted). Consequently, a court may not dismiss a complaint for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). In keeping with this liberal pleading standard, the district court should grant the plaintiff leave to amend if the complaint can possibly be cured by the inclusion of additional factual allegations. *Doe v. United States*, 58 F.3d 494, 497 (9th Cir.1995).

In its moving papers, Unocal attacks the First Amended Complaint on grounds that the allegations connecting Unocal to SLORC's alleged violation of human rights are vague and conclusory. For purposes of a motion to dismiss, however, plaintiffs' complaint sufficiently alleges both the existence of Unocal's and SLORC's joint venture or implied partnership and Unocal's knowledge of and acceptance of the benefits of alleged human rights violations in conjunction with the Project. Despite the poor organization of the complaint, these allegations are sufficient to put Unocal on notice of the claims against it, and the motion to dismiss is denied without prejudice to Unocal's right to move to dismiss specific claims asserted in the Second Amended Complaint once it has been filed with the Court.

### F. Statute of Limitations

The parties dispute the length of the limitations period for the ATCA. Prior to enactment of the Torture Victim Protection Act [36] ("TVPA"), which provides a ten-year limitations period, some courts looked to state law to borrow a statute of limitations because the ATCA contains no limitations period of its own. See *Forti v. Suarez–Mason*, 672 F.Supp. 1531, 1548–49 (N.D.Cal.1987). In *Forti*, the district court applied the one-year limitations period for personal injury actions under California law, reasoning that there was no need to look beyond the state law for a limitations period because the most analogous federal law was § 1983. *Id.* at 1548.

Plaintiffs argue that the TVPA ten-year period provides the closest federal analogy and that reliance on pre-TVPA analogies to § 1983 and the forum state's personal injury statute of limitations would undermine the need for uniformity and the purpose of the federal cause of action. The Supreme Court recently explained that

> reference to federal law is the exception, and we decline to follow a state limitations period only when a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking.

*North Star Steel Co. v. Thomas*, 515 U.S. 29, 35, 115 S.Ct. 1927, 1931, 132 L.Ed.2d 27 (1995) (citations and internal quotation marks omitted). Nonetheless, neither the Supreme Court nor the Ninth Circuit has passed on the question of the correct limitations period for ATCA claims. Two district courts have concluded that the TVPA period does apply to all claims under the ATCA. *See Cabiri v. Assasie–Gyimah*, 921 F.Supp. 1189 (S.D.N.Y. 1996); *Xuncax v. Gramajo*, 886 F.Supp. 162 (D.Mass.1995).

In *Hilao v. Estate of Ferdinand Marcos*, 103 F.3d 767, 779 (9th Cir.1996), however, the Ninth Circuit found it unnecessary to decide whether the TVPA ten-year period applies to all claims under the ATCA because the limitations period was equitably tolled in any event. Here, plaintiff John Doe I has raised an issue of fact regarding the availability of equitable tolling, and the Court need not determine, at this juncture, whether the TVPA limitations period is applicable to plaintiffs' ATCA claim.

With respect to their state law tort claims, plaintiffs do not actively contest defendants' argument that, absent tolling or the effect of the continuing violation doctrine,

---

**36.** The TVPA is set forth in the notes following the ATCA at 28 U.S.C. § 1350. Under the TVPA, torture is defined, in relevant part, as "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering ... whether physical or mental, is intentionally inflicted on that individual for such purposes as ... intimidating or coercing that individual or a third person[.]" 28 U.S.C. § 1350 note, § 3(b)(1).

California's one–year statute of limitations for personal injury torts applies. As the Court explained above, the FTUB has standing in its own right to assert only a negligence claim based on diversion of organizational resources.

The FTUB alleges that the acts against its members that form the basis of its "diversion of resources" claim are ongoing. Accordingly, the FTUB can assert its negligence claim with respect to all resources expended in the year preceding the filing of the complaint to the extent the FTUB can demonstrate that those resources were expended in response to violations of the law for which defendants are liable. The parties have not had an opportunity to address the application of the continuing violations doctrine to the FTUB's negligence claim, and the Court leaves that matter for another day.

John Doe I alleges that he was subjected to forced labor on several occasions between November 1993 and March 1996 and was forced to flee to Thailand with his family in May of 1996. The complaint was filed on September 3, 1996. Because John Doe I's allegations raise a factual issue with respect to equitable tolling, the Court need not address the limitations issue at this time.

## G. Equitable Tolling

■ Under federal law, equitable tolling is available where (1) defendant's wrongful conduct prevented plaintiff from asserting the claim; or (2) extraordinary circumstances outside the plaintiff's control made it impossible to timely assert the claim. *Forti*, 672 F.Supp. at 1549 (holding that given pervasiveness of military's reign of terror plaintiffs might be able to demonstrate that they were denied access to Argentine courts). Applying this same test, the Ninth Circuit recently concluded that because of extraordinary circumstances outside plaintiffs' control resulting in fear of intimidation and reprisal, claims against Marcos for injury from torture, disappearance, or summary execution were tolled until he left office. *Hilao*, 103 F.3d at 772.

■ Unocal contends that plaintiffs have failed to allege extraordinary circumstances outside their control that made it impossible for them to timely assert their claims. *See*

*Forti*, 672 F.Supp. at 1549. Unocal takes the position that John Doe I cannot rely on the situation in Burma to support equitable tolling because he became a refugee. That argument is not only in conflict with the allegations of the First Amended Complaint that SLORC has attacked refugee camps on the Thai border, but is immaterial with respect to John Doe I. He alleges that he fled Burma in May of 1996. Thus, his claims arising prior to that time may be equitably tolled as a result of extraordinary circumstances outside his control that made it impossible for him to assert his claims in Burma. In fact, based on the Ninth Circuit's decision in *Hilao*, John Doe I's claims may well be tolled as long as SLORC remains in power if he can show that he is unable to obtain access to judicial review in Burma. *See Hilao*, 103 F.3d at 772.

Plaintiffs' allegations are sufficient to raise an issue of fact as to whether the limitations period was tolled. Accordingly, the Court need not address the applicability of the continuing violation doctrine.

## V.

### Conclusion

The NCGUB lacks standing to bring this action in a United States Court. The FTUB lacks standing to sue as a representative of its members, but has standing to assert a negligence claim on its own behalf for alleged injury to its organizational interests. The act of state doctrine does not bar consideration of John Doe I's claims of torture and forced labor, but the doctrine bars all claims for expropriation of property. Accordingly, the motion to dismiss is granted with respect to claims by the NCGUB, the FTUB in its representative capacity, and the individual plaintiffs' claims for conversion and trespass.

Plaintiffs shall have leave to amend as follows: (1) to delete claims for expropriation of property, including claims for conversion and trespass; (2) to insert a separate claim by the FTUB for negligence, keeping in mind the strictures of Fed.R.Civ.P. 11; and (3) to augment factual allegations with respect to plaintiffs John Doe I, II, III and IV's claims based on the ATCA to the extent they allege violations of international law not set forth in the First Amended Complaint.

Plaintiffs shall not amend the complaint in any other respect. Specifically, plaintiffs shall not add new claims, new parties or class allegations without leave of Court. The Court will not entertain a motion for leave to further amend the complaint until it resolves the pending preliminary injunction and class certification motions in *John Doe I.* Plaintiffs shall file their Second Amended Complaint within 15 days of entry of this order.

**IT IS SO ORDERED.**

### Exhibit A

FRANK W. HUNGER
Assistant Attorney General
NORA M. MANELLA
United States Attorney
VINCENT M. GARVEY
Deputy Director,
Federal Programs Branch
JACQUELINE BECERRA
Trial Attorney, Civil Division
Federal Programs Branch
U.S. Department of Justice
Post Office Box 883
Room 953
Washington, D.C. 20044
Telephone: (202) 616–8298
Facsimile: (202) 616–8202
Attorneys for the United States

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA WESTERN DIVISION

NATIONAL COALITION GOVERNMENT OF THE UNION OF BURMA, THE FEDERATION OF TRADE UNIONS OF BURMA JOHN DOE I, JOHN DOE II, JOHN DOE III, and JOHN DOE IV,
Plaintiffs,

v.

UNOCAL INC., and the YADANA NATURAL GAS PROJECT,
Defendants.

Case No.:
CIV. NO. 96–6112–RAP(BQRx)

STATEMENT OF INTEREST OF THE UNITED STATES

On April 24, 1997, this Court invited the Department of State "to express its views concerning the ramifications this litigation may have on the foreign policy of the United States as established by Congress and the Executive." *See* Letter from the Honorable Richard A. Paez to Michael J. Matheson of April 24, 1997. Pursuant to 28 U.S.C. §§ 516–17, the Attorney General, on behalf of the Department of State, hereby submits the following.

Attached hereto as Exhibit A is a letter, dated July 8, 1997, from Michael J. Matheson, Acting Legal Adviser, U.S. Department of State, to Frank W. Hunger, Assistant Attorney General, which, while noting the limited nature of the Department of State's reply, advises that "at this time adjudication of the claims based on allegations of torture and slavery would not prejudice or impede the conduct of U.S. foreign relations with the current government of Burma." *See* Exhibit A, at 2.

Respectfully submitted,

FRANK W. HUNGER
Assistant Attorney General

NORA M. MANELLA
United States Attorney

/s/ Jacqueline Becerra

VINCENT M. GARVEY
Deputy Director
JACQUELINE BECARRA
Trial Attorney, Civil Division
Federal Programs Branch
U.S. Department of Justice
Post Office Box 883, Room 953
Washington, D.C. 20044
Telephone: (202) 616–8298
Facsimile: (202) 616–8202
Attorneys for the United States

Dated: July 8, 1997

Jul – 8 1997

The Honorable
Frank W. Hunger
Assistant Attorney General
Civil Division
Department of Justice
Washington, D.C. 20530

Dear Mr. Hunger:

By letter dated April 24, 1997, District Judge Richard Paez of the Central District of California invited the Department of State to express its views in *National Coalition Government of the Union of Burma v. Unocal* (CV 96–6112 RAP) and *John Doe I v. Unocal* (CV 96–6959 RAP). In these cases, various plaintiffs have filed suit against U.S. and foreign participants in the Yadana gas pipeline project in Burma.

The Court issued its invitation following its March 25, 1997 and April 24, 1997 rulings on defendant Unocal's motion to dismiss in the *John Doe* case. In these rulings, the Court concluded that, with the exception of plaintiffs' expropriation claims, the act of state doctrine was not a bar to adjudication. The Court specifically concluded that the act of state doctrine would not preclude consideration of claims based on alleged acts of torture and slavery.

The Court has yet to rule on a pending motion to dismiss filed by Unocal in the *National Coalition Government of the Union of Burma* case, which also presents an act of state objection to the litigation of plaintiffs' claims. In its letter to the State Department, the Court indicated that "before these actions proceed much further," it wished to invite our views "concerning the ramifications this litigation may have on the foreign policy of the United States as established by Congress and the Executive."

It is our understanding that both cases are at a very preliminary procedural stage. Thus, the record upon which the Court has asked for the Department's views is undeveloped, and the Department's ability to provide the Court with meaningful comment is limited. In particular, the Department is not in a position at this time to express a view as to whether the act of state doctrine is necessarily implicated in the cases before the Court, nor would we want this letter to imply that we have reviewed or taken a position on any other legal issues in the litigation.

Nevertheless, in response to Judge Paez's request, the Department can state that at this time adjudication of the claims based on allegations of torture and slavery would not prejudice or impede the conduct of U.S. foreign relations with the current government of Burma. I would appreciate if you would transmit this foreign policy view to the court in the appropriate form.

Sincerely,

/s/ Michael J. Matheson

Michael J. Matheson
Acting Legal Adviser